IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 5:20CR021 |
| | ) | |
| Plaintiff, | ) | JUDGE DONALD C. NUGENT |
| | ) | |
| v. | ) | |
| | ) | |
| PATRICK LALLY, | ) | GOVERNMENT'S RESPONSE IN |
| | ) | OPPOSITION TO DEFENDANT'S |
| Defendant. | ) | MOTION FOR A DOWNWARD |
| | ) | VARRIANCE |

Now comes the United States of America, by and through its counsel, Michelle M.

Baeppler, First Assistant United States Attorney, and Justin Seabury Gould, Robert J. Patton, and

Suzana K. Koch, Assistant United States Attorneys, and responds in opposition to defendant's

motion for a downward variance.  The United States intends to further allocute on these and

other matters when this matter comes before the Court for sentencing.

Respectfully submitted,

MICHELLE M. BAEPPLER
First Assistant United States Attorney

By:      /s/ *Justin Seabury Gould*
Justin Seabury Gould (OH: 0084584)
Robert J. Patton (OH: 0066590)
Suzana K. Koch (OH: 0073743)
Assistant United States Attorneys
United States Court House
801 West Superior Avenue, Suite 400
Cleveland, Ohio 44113
Tel. No. (216) 622-3869/3856/3748
E-mail: Justin.Gould@usdoj.gov
E-mail: Robert.Patton2@usdoj.gov
E-mail: Suzana.Koch@usdoj.gov

## MEMORANDUM

Victim Hometown Bank ("Hometown"), and its predecessor entities, have helped people in and around Kent, Ohio, build homes, grow businesses, and save for their futures since the late eighteen-hundreds.  Though it has changed through the decades, Hometown's business is still built on local values and traditions like knowing their customer's names, learning the intricacies of their businesses, and making financial decisions not just to protect its bottom-line, but also to serve the communities where it does business.  For example, when Hometown decides to extend credit to a business, the bank's committee heavily relies on the input of its loan officers who have visited with that business, gotten to know its employees and work, and can provide a wholistic view of its finances that are not always captured in mere spreadsheets and credit reports.  Defendant Patrick Lally ("Lally"), through now former Hometown loan officer Steven McDonald ("McDonald"), took advantage of  Hometown's local sensibilities and lending process to defraud the bank out of millions of dollars.  Years after he was charged, and only days before trial, Lally finally pleaded guilty to the three counts of bank fraud as charged against him in the indictment.  (R. 8: Indictment; R. 136: Plea Advisory, R. 137: Change of Plea Minutes, PageID 622).  He now comes before the Court for sentencing.

## I.     The Universal Framework of Sentencing

When fashioning an appropriate sentence, a court must first consider the applicable guidelines range under 18 U.S.C. § 3553(a)(4).  *United States v. Thompson*, 515 F.3d 556, 560 (6th Cir. 2008).  In *Kimbrough v. United States*, 128 S. Ct. 558, 570 (2007), the Supreme Court re-affirmed the sentencing regime announced in *United States v. Booker*, which requires district courts to consider the advisory Guidelines, but recognizes that district courts have discretion to tailor a sentence in light of the other statutory concerns set forth in 18 U.S.C. § 3553(a).  Although the sentencing guidelines are advisory, they are the "starting point and the initial

benchmark" for federal sentencing.  *Thompson*, 515 F.3d at 560-61.  A court may find facts by a preponderance of the evidence when calculating the appropriate guidelines range.  *United States v. Gates*, 461 F.3d 703, 707-08 (6th Cir. 2006).  Once a court has determined the appropriate sentencing range, it should then consider that range in light of the other relevant § 3553(a) factors.  *Thompson*, 515 F.3d at 561.

The Court must impose a sentence that is sufficient, but not greater than necessary, to achieve the statutory purposes of punishment, those being:

1. to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

2. to afford adequate deterrence to criminal conduct;

3. to protect the public from further crimes of the defendant; and

4. to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

## II.    The Undisputed Loss in this Matter is $993,500

There is no disagreement about the loss in this matter.  The United States Pretrial and Probation Department ("USPPD") found that the loss was $993,500.  (R. 144: Revised Final PSR, PageID 694, Para. 15).  Lally does not object.  (Id., PageID 707).  The government agrees both as to the amount and the manner of calculation.

### A.    Legal Standard for Making Findings Related to Loss

This Court must make a finding as to loss amount by a preponderance of the evidence using a reasonable estimate predicated upon the facts of the case. *United States v. Blackwell*, 459 F.3d 739, 772 (6th Cir. 2006) (citing *United States v. Davidson*, 409 F.3d 304, 310 (6th Cir. 2005)).  In describing the above standard for ascertaining a loss amount, the Sixth Circuit noted that, the district court's findings are not to be overturned unless they are clearly erroneous.

*United States v. Triana*, 468 F.3d 308, 321 (6th Cir. 2006) (citing *United States v. Guthrie*, 144 F.3d 1006, 1011 (6th Cir. 1998)) See *United States v. Poulsen*, 655 F.3d 492, 512-513 (6th Cir. 2011) (reviewing the District Court's adherence to Rule 32(i) of the Federal Rules of Criminal Procedure as part of making a ruling on loss amount) and *United States v. Abdelsalam*, 311 F. App'x. 832, 845-846, 2009 WL 415987 (6th Cir. 2009).

**B.    The Loan Documents Signed by Lally Clearly Establish the Loss**

Each of the instant indictment's three-counts charges a separate loan that Lally fraudulently obtained from Hometown.[1]  (R. 8: Indictment, PageID 24-29).  The government will detail these three charged loans now and will detail the eight additional "downstream" loans below in its analysis of the restitution Lally owes.  These eleven loans are referred to herein collectively as "the Notes."  Lally was either a direct borrower or a personal guarantor for each of the Notes and liable for all the amounts due pursuant to the Notes.

**i.    Count 1: The First Fraudulent Note**

On or about January 29, 2010, Lally promised to repay $43,500 to Hometown Bank, evidenced by a Promissory Note ("Note #1"), and identified as Loan Number 01-51-02281-0, attached hereto as Exhibit 1.  Note #1 was secured by Commercial Security Agreements dated January 29, 2010, attached hereto as Exhibit 2 (collectively, "Security Agreement #1").  In Security Agreement #1, Lally agreed that the definition of "Debt" meant "all present and future debts" and including any debt "secured by other collateral," as well as "future debt . . . unrelated to or of a different type than the current debt."  In Security Agreement #1, Lally agreed that the

---

[1]    Lally fraudulently secured several types of commercial credit including loans and lines of credit the distinction is irrelevant to the fraudulent nature of his actions.  For simplicity, the commercial credit, no matter the type, is referred to generally as "loans" or "notes."

definition of "Default" included not just a failure to make payment in full when due pursuant to Note #1, but also if he "failed to perform any condition or keep any covenant on this or any debt or agreement" with Hometown Bank; if a default occurred the terms of any instrument or agreement; and anything else happened that caused Hometown Bank to reasonably believe it would have difficulty collecting the Debt.  In Security Agreement #1, Lally further agreed that after a default, Hometown's remedies included making "all or any part" of the Debt due immediately, as well as allowing Hometown to take possession of collateral.

### ii.     Count 2: The Second Fraudulent Note

On or about February 19, 2010, Lally promised to repay $750,000 to Hometown Bank, evidenced by a Promissory Note ("Note #2"), identified as Loan Number 01-43-01862-0, and attached hereto as Exhibit 3.  Note #2 was later modified on July 13, 2010, by a Commercial Debt Modification Agreement, attached as page two of Exhibit 3.  Note #2 was secured by Commercial Security Agreements dated February 19, 2010, attached hereto as Exhibit 4 (collectively, "Security Agreement #2").  Security Agreement #2 includes the same definitions of Debt and Default, and the same remedies, as Security Agreement #1.

### iii.     Count 3: The Third Fraudulent Note

On or about July 13, 2010, Lally refinanced some of his existed debt to Hometown Bank and incurred new debt, in the total amount of $225,000.  This refinanced and new debt obligation was evidenced by a Promissory Note and identified as Loan Number 01-51-02252-0.  This Note was modified on July 20, 2010, to be reduced to $200,000 by a Commercial Debt Modification Agreement (together with the Note, "Note #3") and attached as Exhibit 5.  Note #3 was secured by a Commercial Security Agreement dated July 13, 2010, attached hereto as Exhibit 6

("Security Agreement #3").  Security Agreement #3 includes the same definitions of Debt and Default, and the same remedies, as Security Agreement #1.

### iv.    The Sum of the three Charged Loans is $993,500, and Represents the Most Conservative Measure of Loss

As noted above, there is no disagreement as to the loss in this matter.  The total loss of $993,500, is reached by adding the sums of the three charged loans: $43,500 (Count 1), $725,000 (Count 2), and $225,000 (Count 3).  However, the loss could have been calculated at a much higher level.  The loss contemplated by the parties does not account for any of the additional eight "downstream" loans that Lally fraudulently obtained.  Hometown would not have issued any of these loans had it known that Lally had used the proceeds of the three charged loans for other than their stated commercial purpose, the most nefarious of which was making multiple payments to McDonald.  These payments are detailed in the government's explanation of the offense conduct.

The government has already briefed the Court on the interconnectedness of the three charged and eight "downstream" loans that Lally fraudulently secured.  (R. 109: Motion to Deem Evidence Intertwined, res gestae, or 404, PageID 333-40).  This close relationship is again detailed below in the government's memorialization of the agreed $2,412,000 restitution in this case.  The government and Hometown have shown great restraint in not advancing the position that at least some of the downstream loans represented additional loss to the bank.  If accepted, this calculation would have resulted in a lower offence level for Lally.  The loss amount in the PSR, which the USPPD rightly notes is "no less than" $993,500, is much lower.  The Court should not now further reduce Lally's sentence through a downward variance.

### III.    There is No Disagreement about the Guidelines Calculation

The Guidelines provision applicable to bank fraud is USSG §2B1.1.  Commentary to USSG §2B1.1, *Statutory Provisions*.  Like loss, there is no disagreement between the parties about the Guidelines calculation in this matter.  The USPPD found that the following calculation is accurate:

| Counts 1-3: Title 18 U.S.C. § 1344: Bank Fraud | | |
|---|---|---|
| Base offense level (for an underlying offense with a statutory maximum term of imprisonment is 20 years or more) | 7 | §2B1.1(a)(1) |
| Loss of not less than $993,500 | 14 | §2B1.1(b)(1)(H) |
| **Adjusted Offense Level** | **21** | |

(R. 144: Revised Final PSR, PageID 695, Paras. 21-26).  From this Adjusted Offense Level, the USPPD subtracted an additional two-levels for acceptance of responsibility pursuant to USSG §3E1.1(a).  (Id., Para. 28).  This resulted in a Total Offense Level of 19.  (Id., Para. 28).  Neither Lally nor the government objects.  (Id., PageID 707).  However, a discussion related to acceptance of responsibility is warranted.

### A.    Lally's Plea, Days Before Trial, Was Untimely and Made Only After the Government's Trial Strategy and Evidence was Revealed

On February 11, 2022, the Court held a pretrial conference where it set this matter for trial on June 27, 2022.  (R. 91: Minutes of Pretrial, February 11, 2022, PageID 284).  The Court later advanced the trial date to June 24, 2022.  (R. N/A: Omnibus Trial Order, June 16, 2022). By agreement of the parties, the Court set the following pretrial dates and deadlines:

1.    A competency hearing on March 9, 2022**;**

2.    Discovery completed on or before May 30, 2022;

3.    Pretrial motions, including motions *in limine*, filed on or before June 6, 2022, with responses due on or before June 13, 2022;

4.    Demonstrative evidence exchanged on or before June 22, 2022;

5.    The trial documents submitted to the Court not later June 22, 2022; and

6.    Trial exhibits, exhibit lists, and witness lists exchanged on or before June 17, 2022, at 4:00 p.m.

(R. N/A: Order Setting Pretrial Dates, February 28, 2022).  Lally did not enter his plea until June 21, 2022, after the government made its arguments in support of its motions in limine, revealed its witnesses, and provided its exhibits.  (R. 136: Change of Plea Minutes, PageID 622).

Both USSG §3E1.1(a), related to the potential two-level reduction for acceptance granted by the Court, and USSG §3E1.1(b), related to the potential one-level reduction for acceptance moved for by the government, contemplate that the timeliness of a defendant's plea should be considered.  The Sixth Circuit has differentiated the timeliness consideration made by the Court and that made by the government.  *States v. Hollis*, 823 F.3d 1045, 1047 (6th Cir. 2016).  While the government may consider timeliness in the context of its expenditure of resources preparing for trial, the Court may only consider timeliness as it "reflects the extent of the defendant's sincerity."  *Id.* at 1047 (citing *United States v. Kumar*, 617 F.3d 612, 637 (2d Cir. 2010)).

With trial four days away, the government was fully prepared to proceed to trial.  It had served subpoenas, completed weeks of witness preparations, and arranged for the interstate travel of witnesses.  It had selected and prepared exhibits for display at trial.  It had exhausted countless hours researching and briefing relevant matters for the Court's condensation.  Based on all this, the government will not make a motion for an additional level of acceptance pursuant to  USSG §3E1.1(b).  While the government does not challenge the two-level reduction contemplated by the USPPD, the Court should understand that this is a generous position.  The Sixth Circuit noted that "timeliness may be an appropriate consideration [for the Court] under subsection (a) when the lateness of the defendant's plea indicates that the defendant is pleading guilty because the government's case has turned out to be strong and not because he or she truly accepts responsibility. Such a situation might occur when the plea comes on the eve of or during trial."

*Id.* at 1047 (citing *Kumar*, 617 F.3d at 637).  Here, Lally made a plea only after the government laid before him its trial evidence and spilled upon the record much of its trial strategy.  That Lally is receiving two-levels of acceptance despite these circumstances weighs heavily against granting him an additional reduction through a downward variance.  While the Court could question the sincerity of Lally's acceptance based on the untimeliness of his plea, the government thinks it is enough to simply deny his motion for a downward variance.

## IV.  The 18 U.S.C. § 3553 Factors Weigh Heavily Against Granting Lally the "Substantial" Downward Variance He Seeks

### A.  The Court Must Provide a Reasonable Explanation of its Application of the 3553 Factors

The Sixth Circuit Court of Appeals requires that a district court provide a reasonable explanation of its application of the sentencing factors set forth in Title 18, § 3553 of the United States Code in imposing a sentence. In *Blackwell*, 459 F.3d at 773, the Sixth Circuit announced:

> The job of the district court is to impose "a sentence sufficient, but not greater than necessary, to comply with the purposes of section 3553(a)." In reaching a sentence that complies with the purposes of § 3553(a), the district court must consider the Sentencing Guidelines range and all relevant § 3553 factors. While a district court need not explicitly reference § 3553 or recite a list of factors, it must provide a reasoned explanation for its choice of sentence and its explanation must be sufficiently thorough to permit meaningful appellate review. . . . This Court will only uphold a sentence if it is reasonable. Reasonableness contains two facets: substantive and procedural. In reviewing for reasonableness, the Court employs a presumption for substantive reasonableness.

(Citations omitted.)  *Id.*  The Sixth Circuit has stated that, "while a district court need not engage in a 'ritualistic incantation' of the § 3553(a) factors, its reasoning must be 'sufficiently detailed to reflect considerations listed in § 3553(a) and to allow for meaningful appellate review.'" *United States v. Tanner*, 382 F. App'x. 421, 423 (6th Cir. 2010) (*quoting United States v. Bolds*, 511 F.3d 568, 581 (6th Cir. 2007) and *United States v. Mayberry*, 540 F.3d 506, 518 (6th Cir.

2008)).  Therefore, a district court must impose a reasonable sentence while expressing enough of its rationale to permit an appellate court to understand the basis for the sentence imposed.

### B.     Offense Nature and Circumstances: Lally Paid a Corrupt Insider to Exploit a Lending Process Built on Trust

Many banks seem to make lending decisions based only on impersonal calculations of risk reflected in credit reports and actuarial data.  Hometown was not one of those.  Hometown used a team of loan officers who, in additional to the standard financial data, endeavored to learn about the people to whom and businesses to which they were lending money.  This research process captured unquantifiable data like work ethic and community impact to help Hometown's lending committee decide how to make lending decisions.  McDonald was Lally's Hometown loan officer.  When McDonald came before Hometown's lending committee, he was a fierce advocate for Lally and his businesses.  In retrospect, this advocacy was not because Lally was running solvent, worthy businesses.  Rather, McDonald was being paid by Lally.

The offense conduct summarized by the USPPD accurately details the loans Lally fraudulently secured from Hometown through McDonald.  (R. 144: Revised Final PSR, PageID 691, Paras. 4-15).  Key to the Court's consideration, however, should be the deceptive steps Lally took to hide the payments he made to McDonald.  This chart shows the transit of Lally's $15,000 payment to McDonald related to the commercial loan charged in Count 1:



Image 1:   Lally Moved Proceeds Out of Hometown and to Personal Account
before Paying McDonald

On January 29, 2010, Hometown issued a check for the $43,252.50 proceeds of the loan charged in Count 1.  On the very same day, Lally deposited those proceeds into the Ace Demo account he controlled and possessed at Home Savings Bank.  He then deposited a check for the same amount into his personal account at Huntington Bank.  Finally, Lally wrote a check from his personal bank account to McDonald, who deposited it into McDonald's personal bank account at then National City Bank.

The following chart shows the transit of Lally's $165,000 payment to McDonald related to the commercial loan charged in Count 2:



Image 2:   Lally Transfers Proceeds Out of Hometown and to a Dormant Account
before Paying McDonald

On February 25, 2019, Hometown deposited the $275,000 proceeds for the loan charged in Count 2 into the Hometown bank account for Ace Demo, which Lally possessed and controlled.  On that day, Lally deposited a check drawn on that account for $165,000 into a dormant account for P&B Music at Home Savings Bank, which he controlled and possessed.

From that dormant account, Lally wrote a check in the amount of $165,000 to McDonald, which McDonald deposited into his personal account at then National City Bank.

The following chart shows the transit of Lally's $15,000 payment to McDonald related to the commercial loan charged in Count 3:



Image 3:   Lally Transfers Proceeds Out of Hometown and to a Dormant Account before Paying McDonald

On July 20, 2010, Lally deposited a check for the $38,292.37 proceeds of the loan charged in Count 3 into his personal investment account at Merrill Lynch.  Less than a week later, he issued a $15,000 check drawn on that account to McDonald, which McDonald deposited into his personal account at then National City Bank.

These payments establish a pattern.  For each payment to McDonald, Lally took the loan proceeds out of Hometown Bank and parked them in an outside account that he controlled and possessed.  This made it impossible for Hometown to see how Lally was using the funds and, more specifically, the substantial payments he was making to his Hometown loan officer. Lally's attempt to obfuscate the payments from Hometown's view shows not only his intention to deceive, but also a knowledge of how wrong those payments were.  The Court should weigh his attempt to evade detection when it considers the nature and circumstances of the offense.

**C.** **History and Characteristics: Lally's Life of Privilege Afforded him Opportunities, Which he Squandered, and Kind Letters Too**

As reported by the USPPD, Lally is the son of a successful car dealer.  He was educated at the private University School in Hunting Valley, Ohio.  He experienced no abuse growing up.  When he turned 18, he was able to move into one of his family's homes in which his father formerly lived.  He attended a private university, Case Western, where he earned a bachelor's degree.  He reports no substance abuse issues.  During and before the instant offense, Lally was making upwards of $40,000 per month through his businesses.  This income was the fruits of his father's car dealership legacy more than a result of Lally's business prowess.  In almost every respect, Lally had a life of opportunity and privilege not seen by many defendants who come before the Court.  Yet, he turned to crime.  Since that decision, Lally's financial situation has changed significantly.  But, the fact remains that when Lally made the decision to defraud Hometown he was not addicted, he was not in financial distress, neither was he homeless or unemployed.  The Court should consider the criminal choices Lally made in light of these privileges.

Lally makes issue of his health concerns in requesting a downward variance.  But, as the Court is aware, he is otherwise able to enjoy life.  During this matter, Lally has found strength to travel to Miami University four times.  He visited Charlotte, North Carolina, once and this Court denied his sixth motion to travel wherein he again asked to visit. (R. 131: Sixth Motion to Travel, PageID 605-06).  This Court knows that Lally will feign the existence or severity of his documented medical and mental concerns to influence this case.  Afterall, the neurophysiological evaluation returned in this matter showed that Lally was malingering.  Now he cites his "infirmities" as a reason to grant his downward variance.

In support of his Motion, Lally has also provided a letters from friends who support him. Such letters should not be dispositive as many defendants who receive them often are deserving of imprisonment. *See United States v. Emmenegger*, 329 F. Supp. 2d 416, 423 (S.D.N.Y. 2004) (commenting that the "vast majority of defendants … continue to receive the love and support of their families," and "[m]any, in turn, love their families and friends … and participate in charitable activities"). The fact that some of Lally's friends and associates think highly of him makes them no different from most other white-collar criminals. *See United States v. McClatchey*, 316 F.3d 1122, 1135 (10th Cir. 2003) ("excellent character references are not out of the ordinary for an executive who commits white-collar crime; one would be surprised to see a person rise to an elevated position in business if people did not think highly of him or her"). This Court should not be surprised that a private school kid from a wealthy family is able to provide letters from community members who support him. Even a retired judge. This is not a reason to reduce his sentence. As the Eighth Circuit stated, in general, white-collar criminals "enjoy sufficient income and community status so that they have the opportunities to engage in charitable and benevolent activities." *United States v. Haversat*, 22 F.3d 790, 796 (8th Cir. 1994). "[W]e expect the district courts to view such evidence with the skepticism of experience in sentencing executives who commit white-collar offenses." *Id.*; *see also United States v. Morken*, 133 F.3d 628, 630 (8th Cir. 1998) (finding defendant's good works unremarkable); *United States v. Millar*, 79 F.3d 338, 345 (2d Cir. 1996) (refusing to review the district court's decision not to depart based upon the defendant priest's charitable works and public service, where the district court recognized its authority to depart; the defendant "had benefits that few defendants have, including education, respect in his work, skills of advocacy, intelligence, and the calling to serve as a priest"); *United States v. Jordan*, 130 F.Supp.2d 665, 672-73 (E.D. Pa. 2001) (denying a departure for a defendant convicted of money laundering, despite numerous letters detailing substantial charitable contributions, generosity to community members in need of food, and

service as mentor for neighborhood youths; these acts, "while commendable, are not so exceptional or extraordinary for a person" like the defendant who owned a small business); *United States v. Scheiner*, 873 F. Supp. 927, 933-35 (E.D. Pa. 1995) (departure was not warranted for a doctor convicted of conspiring to defraud an insurance company, despite his contributions to the young and poor minorities, including financial sponsorship of several basketball teams, serving on several community boards, working in a podiatry clinic where free services were provided to the poor, and generally [having] served as a source of support and inspiration to many).

These decisions are grounded in the recognition that individuals with sufficient stature, ability, and opportunity to earn sizable incomes are often involved in community service and charitable endeavors, but that such activities do not remove the defendant from the contemplated heartland of defendants charged with white-collar offenses.  Indeed, it is widely recognized that "the [Sentencing] Commission intended its guidelines and policy statements to 'equalize punishments for white collar and blue collar crime,'" and courts have endeavored to implement that intention in sentencing. *United States v. Thurston*, 358 F.3d 51, 80 (1st Cir. 2004) (reversing the district court's downward departure where the white-collar defendant's good works, although "admirable," were insufficient to qualify as exceptional in light of, among other things, his status as a prominent corporate executive with the means to make financial contributions and engage in civic and charitable activities), vacated on other grounds, 125 S. Ct. 984 (2005); *see also United States v. Wright*, 363 F.3d 237, 248-49 (3d Cir. 2004) (upholding the district court's denial of a downward departure where the defendant minister's good works, although "profound," "substantial," and "sustained," were not so extraordinary as to justify a downward departure).

As District Judge Marrero in the Southern District of New York observed:

> [W]hite collar offenders, because of their greater wealth and leadership in the community, enjoy much greater opportunities to participate and rise to prominence in charitable activities, and also possess the means to contribute resources with larger generosity to community service organizations. These social and economic advantages could enable

> them to gain a substantial edge over blue collar offenders who cannot make claim to comparable means and opportunities with which to mitigate the full impact of a heavy sentence.

*United States v. Fishman*, 631 F. Supp.2d 399, 403 (S.D.N.Y. 2009). To grant a downward variance based on the "good deeds" Lally's friends report would in effect be penalizing poorer defendants.

### D. Reflect the Serious of the Offense, to Promote Respect for the Law, and to Provide Just Punishment: Hometown Bank Was in Crisis

The advisory Guidelines in this matter call for a sentence of 30 to 37 months.  A representative from Hometown will testify at sentencing.  The Court should consider the heavy consequences of Lally's criminal acts on the community bank he chose to victimize.  The Court will hear how Hometown was thrown into crisis by the frauds Lally committed.  They were faced with a regulatory investigation.  They feared their community reputation would be ruined. The impact on Hometown, combined with the contempt exhibited by a man of privilege committing these financial crimes, underscored the need for a sentence within the Guidelines range.

### E. Afford Adequate Deterrence and Protect the Public: Allowing Individuals of Wealth to Use their Positions and Histories to Escape Punishment Promotes Crime

Imposing a sentence within the Guidelines range would also deter others like Lally from thinking that they can commit fraud and avoid punishment because they come from favorable backgrounds.  *United States v. Flores-Machicote*, 706 F.3d 16, 22 (1st Cir. 2013) ("Deterrence is widely recognized as an important factor in the sentencing calculus."); *United States v. Miller*, 484 F.3d 964, 967-68 (8th Cir. 2007) ("general deterrence . . . is one of the key purposes of sentencing . . ."); *United States v. Jackson*, 835 F.2d 1195, 1199 (7th Cir. 1987) (Posner, J., concurring) ("deterrence is the surest ground for punishment . . . since incapacitation may, by removing one offender from the pool of offenders, simply make a career in crime more attractive

to someone else, who is balanced on the razor's edge between criminal and legitimate activity and who now faces reduced competition in the crime 'market.'"").  As courts have noted, deterrence is particularly important in "white-collar crimes, because they are often perceived as carrying substantially lesser punishment than other comparable offenses."  *United States v. Panyard*, No. 07-20037-2, 2009 WL 1099257, at *12 (E.D. Mich. April 23, 2009).   The Sixth Circuit has acknowledged, ". . . economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence."  *United States v. Peppel*, 707 F.3d 627, 637 (6th Cir. 2013) (quoting *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006)).  So many of the characteristics to which Lally cites when arguing for a downward variance are things that were ensured by his upbringing.  To grant a downward variance would suggest to others like Lally that their status will insulate them from punishment.

## V.    Restitution, to Which the Parties Stipulate, will be Ordered Against Defendant Patrick Lally Pursuant to the Mandatory Victim Rights Act

The parties in this matter have stipulated to restitution of $2,412,000.  (R. 147: Joint Restitution Stipulation, PageID 729).  Restitution orders are authorized by statute, 18 U.S.C. §§ 3663, 3663A, and 3664, and are distinct and separate from the United States Sentencing Guidelines.  When sentencing a Defendant convicted of an offense against property under Title 18 of the United States Code, including any offense committed by fraud or deceit, the Mandatory Victims Restitution Act (the "MVRA") requires the court to order that the defendant make restitution to the victim of that offense.  18 U.S.C. §§ 3663A(a)(1); 3663A(c)(1)(A)(ii).  The MVRA requires those convicted of offenses against property under Title 18 to pay restitution for victims' losses.  *United States v. Elson*, 577 F.3d 713, 721 (6th Cir. 2009).

Restitution constitutes punishment. *United States v. Schulte*, 264 F.3d 656 (6th Cir. 2001); *see also United States v. Bearden*, 274 F.3d 1031, 1041 (6th Cir. 2001) (restitution is "punitive rather than compensatory in nature"). "Although the guidelines mandate imposition of restitution where allowable under the statutes, the restitution statutes function independently from the guidelines and do not rely on the guidelines for their validity." *United States v. Sosebee*, 419 F.3d 451, 462 (6th Cir. 2005). "Restitution under the MVRA is a criminal penalty and a component of the defendant's sentence." *United States v. Adams*, 363 F.3d 363 (5th Cir. 2004) (*quoting United States v. Chaney*, 964 F.2d 437, 451 (5th. Cir. 1992)).

The MVRA specifically states that the amount of restitution should be equal to the "amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant." 18 U.S.C. § 3664(f)(1)(A) (when a court is ordering restitution, the amount of restitution should be equal to the "amount of each victim's losses as determined by the court." *Sosebee*, 419 F.3d at 462 (18 U.S.C. § 3664(f)(1)(A) (emphasis in original)).

**A.    Restitution should be made payable by Defendant Patrick Lally to the victim, Hometown Bank, in the amount of $2,412,000.**

In this case, the victim, Hometown Bank, was directly harmed as a result of the Defendant's actions. As a direct and proximate result of Defendant's bank fraud, Hometown Bank suffered significant financial loss. This loss would not have occurred if not for the Defendant's actions.

**B.    The Loan Documents were intertwined such that Lally is liable for all of the loss to Hometown Bank**

The three charged Notes that Lally fraudulently obtained are explained in detail above. The government now turns to the eight additional Notes Lally executed as part of his fraudulent

scheme.  All the Notes were intertwined, each with every other, such that a default under any one of the Notes was a default under all of the Notes.  Additionally, the collateral pledged for any of the Notes pursuant to the Security Agreements (as below-defined) was also collateral pledged for all of the Notes.  Lally's failure to pay any Note when due, and the criminal bank fraud in this case, were defaults under each and every one of the Loan Documents.  As a result of these defaults, the total amount due to Hometown Bank is $2,412,000.

### i.      The Fourth Fraudulent Note

Or about August 25, 2010, Lally promised to repay $72,000 to Hometown Bank, evidenced by a Promissory Note ("Note #4"), identified as Loan Number 01-57-02326-0, and attached hereto as Exhibit 7.  Note #4 was secured by Commercial Security Agreements dated August 25, 2010, attached hereto as Exhibit 8 (collectively, "Security Agreement #4").  Security Agreement #4 includes the same definitions of Debt and Default, and the same remedies, as detailed above for Security Agreement #1.

### ii.     The Fifth Fraudulent Note

On or about December 10, 2010, Lally promised to repay $231,296 to Hometown Bank, evidenced by a Promissory Note ("Note #5"), identified as Loan Number 01-51-02277-0, and attached hereto as Exhibit 9.  Note #5 was secured by a Commercial Security Agreement dated December 10, 2010, attached hereto as Exhibit 10 ("Security Agreement #5").  Security Agreement #5 includes the same definitions of Debt and Default, and the same remedies, as Security Agreement #1.

### iii.    The Sixth Fraudulent Note

On or about February 11, 2011, Lally promised to repay $1,000,000 to Hometown Bank, evidenced by a Promissory Note ("Note #6"), identified as Loan Number 01-43-01891-0, and

attached hereto as Exhibit 11.  Note #6 was secured by Commercial Security Agreements dated February 11, 2011, attached hereto as Exhibit 12 (collectively "Security Agreement #6"). Security Agreement #6 includes the same definitions of Debt and Default, and the same remedies, as Security Agreement #1.

### iv. The Seventh Fraudulent Note

On or about June 3, 2011, Lally refinanced some of his existed debt to Hometown Bank, evidenced by a Promissory Note ("Note #7"), in the amount of $973,000, identified as Loan Number 01-51-02308-0, and attached hereto as Exhibit 13.  Note #7 was secured by a Commercial Security Agreement dated June 3, 2011, attached hereto as Exhibit 14 ("Security Agreement #7").  Security Agreement #7 includes the same definitions of Debt and Default, and the same remedies, as Security Agreement #1.  Note #7 was also secured by an Unconditional Guarantee dated June 3, 2011, and signed by Lally ("Unconditional Guarantee #7"), attached hereto as Exhibit 15.  In Unconditional Guarantee #7, Lally unconditionally guaranteed payment of all amounts due under Note #7.

### v. The Eighth Fraudulent Note

On or about August 30, 2011, Lally promised to repay $150,000 to Hometown Bank, evidenced by a Promissory Note ("Note #8"), identified as Loan Number 01-50-01872-0, and attached hereto as Exhibit 16.  Note #8 was later modified on January 31, 2012 by a Commercial Debt Modification Agreement, attached as part of Exhibit 17.  Note #8 was secured by Commercial Security Agreement dated August 30, 2011, attached hereto as Exhibit 18 ("Security Agreement #8").  Security Agreement #8 includes the same definitions of Debt and Default, and the same remedies, as Security Agreement #1.  Note #8 was also secured by a Guaranty dated August 20, 2011, and signed by Lally ("Guaranty #8"), attached hereto as Exhibit 19.  In the

Guaranty #8, Lally absolutely and unconditionally guaranteed payment of "each and every debt, liability and obligation of every type and description which Borrower may now or at any time hereafter owe to Lender [Hometown Bank] (whether such debt, liability or obligation now exists or is hereafter created or incurred, and whether it is or may be direct or indirect, due or to become due, absolute or contingent, primary or secondary, liquidated or unliquidated, or joint, several, or joint and several)."

### vi. The Ninth Fraudulent Note

On or about September 21, 2011, Lally promised to repay $28,451 to Hometown Bank, evidenced by a Promissory Note ("Note #9"), identified as Loan Number 01-57-02388-0, and attached hereto as Exhibit 20.  Note #9 was secured by Commercial Security Agreements dated September 21, 2011, attached hereto as Exhibit 21 (collectively, "Security Agreement #9").  Security Agreement #9 includes the same definitions of Debt and Default, and the same remedies, as Security Agreement #1.

### vii. The Tenth Fraudulent Note

On or about March 29, 2012, Lally promised to repay $900,000 to Hometown Bank, evidenced by a Promissory Note ("Note #10"), identified as Loan Number 01-48-01429-0, and attached hereto as Exhibit 22.  Note #10 was secured by a Commercial Security Agreement dated March 29, 2012, attached hereto as Exhibit 23 ("Security Agreement #10").  Security Agreement #10 includes the same definitions of Debt and Default, and the same remedies, as Security Agreement #1.

### viii. The Eleventh Fraudulent Note

On or about February 15, 2013, Lally refinanced some of his existed debt to Hometown Bank and incurred new debt, in the total amount of $2,412,000.  This refinance and new debt

obligation was evidenced by a Promissory Note ("Note #11"), identified as Loan Number 01-50-01930-0, and attached hereto as Exhibit 24.  Note #11 was secured by a Commercial Security Agreement dated February 1, 2013, attached hereto as Exhibit 25 ("Security Agreement #11").  Security Agreement #11 includes the same definitions of Debt and Default, and the same remedies, as Security Agreement #1.  Note #11 was also secured by a Guaranty dated February 15, 2013, and signed by Lally ("Guaranty #11"), attached hereto as Exhibit 26.  In the Guaranty #11, Lally guaranteed the payment and performance of "each and every debt, liability and obligation of every type and description which Borrower may now or at any time hereafter owe to Lender [Hometown Bank] (whether such debt, liability or obligation now exists or is hereafter created or incurred, and whether it is or may be direct or indirect, due or to become due, absolute or contingent, primary or secondary, liquidated or unliquidated, or joint, several, or joint and several)."

Notes #1, 2, 3, 4, 5, 6, 7, 8, 9, 10, and 11 are hereinafter collectively referred to as the "Notes."  Security Agreements #1, 2, 3, 4, 5, 6, 7, 8, 9, 10, and 11 are hereinafter collectively referred to as the "Security Agreements."  The Notes, Security Agreements, Unconditional Guarantee #7, Guaranty #8, and Guaranty #11 are collectively referred to as the "Loan Documents."  Lally's criminal actions, together with the intertwined Loan Documents, make him liable to Hometown Bank for all the debt he incurred, promised, or guaranteed to pay.

## C.    Specific payment terms requested

The United States requests that the Court establish the following conditions of restitution payment in accordance with the Court's authority under 18 U.S.C. §§ 3572 and 3664(f), which should be applicable until such time as Lally has satisfied the financial obligations to be imposed by the judgment:

22

1.    the special assessment must be paid in a lump sum due immediately; and

2.    payment of restitution is due immediately.  Any restitution amount that remains unpaid when the Defendant's supervision commences is to be paid on a monthly basis at a rate of at least 25% of Defendant's gross earnings, to be changed during supervision, if needed, based on Defendant's changed circumstances, pursuant to 18 U.S.C. § 3572(d)(3). If Defendant receives an inheritance, any settlements (including divorce settlement and personal injury settlement), gifts, tax refunds, bonuses, lawsuit awards, and any other receipt of money (to include, but not be limited to, gambling proceeds, lottery winnings, and money found or discovered) the defendant must, within 5 days of receipt, apply 100% of the value of such resources to any restitution still owed.

Finally, as noted in the parties' joint restitution stipulation, $195,000 of the $2,412,000 restitution to Hometown should be joint and several with the restitution ordered in the matter of *United States v. Steven P. McDonald*, case number 5:12CR0451.

## VI.    Conclusion

For the reasons detailed above, the Court should deny Lally's motion for a downward departure and sentence him within the advisory Guideline range.  Additionally, the United States respectfully requests that the Court order immediate payment of restitution by Lally to Hometown Bank in the amount of $2,412,000.  The United States further requests that the Court

order Lally to pay the special assessment in a lump sum due immediately; and that payment of restitution is due immediately.

Respectfully submitted,

MICHELLE M. BAEPPLER
First Assistant United States Attorney

By:     /s/ *Justin Seabury Gould*
Justin Seabury Gould (OH: 0084584)
Robert J. Patton (OH: 0066590)
Suzana K. Koch (OH: 0073743)
Assistant United States Attorneys